

**FILED**

OCT 22 2014

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

 v.

WILLIAM F. MCCRAY,

        Defendant - Appellant.

No. 10-56466

D.C. No. 3:09-cv-00614-MMA
U.S. District Court for Southern
California, San Diego

**MANDATE**

The judgment of this Court, entered August 27, 2014, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure.

                FOR THE COURT:
                Molly C. Dwyer
                Clerk of Court

                Jessica F. Flores
                Deputy Clerk

FILED

AUG 27 2014

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff - Appellee,<br><br>  v.<br><br>WILLIAM F. MCCRAY,<br><br>        Defendant - Appellant. | No. 10-56466<br><br>D.C. Nos.   3:09-cv-00614-MMA<br>                 3:00-cr-02580-MMA-<br><br>MEMORANDUM[*] |

Appeal from the United States District Court
for the Southern District of California
Michael M. Anello, District Judge, Presiding

Argued and Submitted August 6, 2014
Pasadena, California

Before: REINHARDT, WARDLAW, and CALLAHAN, Circuit Judges.

William F. McCray appeals the district court's denial of his 28 U.S.C.

§ 2255 motion to vacate his convictions for promotional money laundering. We

have jurisdiction under 28 U.S.C. § 2253(a), and we reverse.

---

     [*]    This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

**1.** The district court erred in concluding that McCray's promotional money laundering counts, counts 23 and 24 of the Indictment, did not merge with his wire fraud counts, counts 16 and 17. The core of McCray's fraudulent scheme was to churn the funds in his investors' accounts to drive up commissions. Unlike a traditional Ponzi scheme, McCray actually used investor capital to trade foreign currency from which he profited by receiving commissions. His trading scheme was a fraud, however, because he misrepresented his returns. The $5.8 million wire transfers to International Forex Limited's account at the Bank of Bermuda (hereafter the "Bermuda Transfers") were a "central component of the scheme to defraud." *United States v. Van Alstyne*, 584 F.3d 803, 815 (9th Cir. 2009). Indeed, after the $5.8 million was transferred to the Bank of Bermuda, subsequent trading in that account generated commissions of over $640,000. As in *Van Alstyne*, where distribution checks sent directly to investors were crucial to the "very nature of the scheme," *id.* at 815, transfers of investor capital to foreign currency exchange trading desks for the purpose of executing trades and generating commissions were at the heart of McCray's scheme.

Furthermore, the Bermuda Transfers were "central to carrying out the scheme's objective of encouraging further investment" and perpetuating the scheme's continued viability. *United States v. Moreland*, 622 F.3d 1147, 1166 (9th

Cir. 2010); *see also United States v. Ali*, 620 F.3d 1062, 1072 (9th Cir. 2010) (holding that there was a "merger" problem because "an illegal scheme to buy and sell discounted software will continue to buy and sell software to perpetuate the scheme"). For example, McCray specifically marketed the benefits of offshore accounts to attract further investment, and some investors even called the Bank of Bermuda to verify that McCray was trading there. Also, unlike in *United States v. Bush*, 626 F.3d 527, 538 (9th Cir. 2010), where the defendant moved money offshore *after* government authorities began investing his scheme, McCray did not transfer funds offshore to hide them. Rather, he transferred the funds to Bermuda months *before* the search warrant was executed for use in his scheme. Although it is unclear what portion of the $5.8 million was used for trading—as opposed to refunds, commissions, or bank fees—the Bank of Bermuda was the most active trading desk in 1999, accounting for 54% of International Forex Limited's commissions that year.

Even if a portion of the Bermuda Transfers was used in a way that did not implicate the "merger" problem, the transfers themselves would remain a "central component of the scheme" because they provided the investor capital necessary to execute trades and generate commissions. *See Moreland*, 622 F.3d at 1165. Therefore, because the Bermuda Transfers were a "central component of the

3

scheme to defraud," McCray's promotional money laundering counts trigger the "merger" problem and the "profits" definition of "proceeds" should apply. *See Van Alstyne*, 584 F.3d at 815-16 (discussing *United States v. Santos*, 553 U.S. 507 (2008)).

The promotional money laundering counts also led to "a radical increase in the statutory maximum sentence." *Bush*, 626 F.3d at 538. While the statutory maximum for the underlying offense of wire fraud was five years, *see* 18 U.S.C. § 1343 (1999), the statutory maximum for promotional money laundering was twenty years, *see* 18 U.S.C. § 1956 (1999). Thus, as warned of by the *Santos* plurality, the money laundering counts "eviscerated" the statutory cap of the underlying offense. 553 U.S. at 527 (Stevens, J., concurring).

Lastly, because the government did not show that the Bermuda Transfers involved profits from McCray's scheme, his promotional money laundering convictions cannot stand. *See Ali*, 620 F.3d at 1072. Thus, the promotional money laundering "counts implicate the merger problem discussed in *Van Alstyne* and *Santos* and, because the government did not show that only profits were used, there is insufficient evidence to support [McCray's] conviction under the promotion[al] money laundering counts." *Id.*

**2.** Even if McCray procedurally defaulted on his *Santos*-based claim, because his claim succeeds on the merits, his default is excused because he has demonstrated "actual innocence." *See United States v. Avery*, 719 F.3d 1080, 1085 (9th Cir. 2013) ("A petitioner is actually innocent when he was convicted for conduct not prohibited by law.") (internal quotation marks omitted). Because the Bermuda Transfers were client capital, and not profits of the scheme, "it is more likely than not that no reasonable juror would have found [McCray] guilty beyond a reasonable doubt." *Id.* at 1083 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). In light of all the evidence, no reasonable juror would have been able to conclude beyond a reasonable doubt that McCray knowingly used the profits from his scheme in the Bermuda Transfers. *See, e.g.*, *Avery*, 719 F.3d at 1085 (holding that defendant's procedural default was excused because he was actually innocent of honest services fraud in light of *Skilling v. United States*, 561 U.S. 358 (2010)).

**3.** Accordingly, we **REVERSE** the denial of McCray's § 2255 motion, **VACATE** his convictions on counts 23 and 24 of the Indictment, and **REMAND** for resentencing in accordance with this disposition.

**REVERSED**, **VACATED**, and **REMANDED**.

<u>USA v McCray 10-56466</u>

CALLAHAN, Circuit Judge, dissenting:

I respectfully dissent. In contrast to the payments to winners and employees of the illegal gambling scheme in *Santos v. United States*, 553 U.S. 507 (2008), the 1999 wire transfers were not critical to McCray's foreign currency currency trading scheme. Although more than half of the commissions generated by the scheme in 1999 were due to trading from McCray's Bank of Bermuda account, the amount of commissions from that account, about $641,000, is less than 10% of the overall total of $6.7 million in commissions generated by the scheme over four years. Furthermore, in 1998, the scheme generated $3.9 million in commissions without *any* trading from the Bank of Bermuda account. Thus, while McCray's scheme required that he transfer money to trading desks, he did not have to engage in wire transfers to the Bank of Bermuda. Contrary to the majority's determination, the transfers were not necessary to "perpetuate the scheme's continued viability." *See* Majority 2.[1]

Since the transfers were not central to the scheme, "proceeds" is defined as gross receipts. *See United States v. Grasso*, 724 F.3d 1077, 1095 (9th Cir. 2013).

---

[1] Further, although McCray made the transfers in an effort to promote his scheme, the evidence in the record tends to show that investors were *not* interested in investing offshore.

1

There is clearly sufficient evidence for a jury to find that the transfers involved gross receipts of McCray's scheme because the transfers were made using fraudulently-obtained client funds. Accordingly, McCray's *Santos* claim fails on its merits.

Finally, I would also hold that McCray is barred from raising his *Santos* merger argument on habeas review. McCray did not raise a merger argument on direct appeal even though such an argument had already been approved in *United States v. Scialabba*, 282 F.3d 475 (7th Cir. 2002). Also, because the 1999 wire transfers were not central to McCray's scheme and clearly involved proceeds of the fraudulent scheme, McCray cannot show actual innocence under *Schlup v. Delo*, 513 U.S. 298, 327 (1995).[2] Accordingly, McCray has not shown cause and prejudice or actual innocence excusing his failure to raise his *Santos* argument in his direct appeal, and his claim is procedurally defaulted under *Bousley v. United States*, 523 U.S. 614, 622 (1998).

Because McCray's *Santos* claim both fails on the merits and is procedurally defaulted, I would affirm the district court's denial of McCray's motion to vacate.

---

[2]Notably, McCray does not challenge his other convictions and does not claim he was actually innocent of operating a fraudulent currency scheme.